## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EVERETT HUGHES**                                    **CIVIL ACTION**

**VERSUS**                                            **NO. 18-11661**

**DARREL VANNOY, WARDEN**                             **SECTION: "F"(5)**

## <u>REPORT AND RECOMMENDATION</u>

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Everett Hughes, is a convicted inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    On May 3, 2012, he was charged by bill of indictment with one count of second-degree murder and one count of attempted second-degree murder.[1]    On September 26, 2013, a jury found him guilty as charged on both

---

[1]  State Rec., Vol. 1 of 7, Bill of Indictment.

counts.[2]    On November 15, 2013, his motions for post-verdict judgment of acquittal and for new trial were denied, and he was sentenced to life imprisonment without benefit of probation, parole or suspension of sentence for second-degree murder and a term of 50 years imprisonment at hard labor without benefit of probation, parole or suspension of sentence for attempted second-degree murder, to run concurrently.[3]

On direct appeal, he asserted that the evidence was insufficient to support the convictions and that his sentences were excessive.    On November 25, 2014, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[4]    On October 9, 2015, the Louisiana Supreme Court denied his application for writ of certiorari.[5]

On or about November 28, 2016, Hughes submitted an application for post-conviction relief to the state district court.[6]    In that application, he asserted that trial counsel was constitutionally ineffective for failing to (1) make contemporaneous objections during trial; (2) call witnesses for the defense and prevent the State from presenting the uncalled witnesses' statements through other means at trial; and (3) investigate and call a defense

---

[2]    State Rec., Vol. 1 of 7, Minute Entry, 9/26/13; *see also* Verdict of the Jury.

[3]    State Rec., Vol. 1 of 7, Minute Entry, 11/15/13.

[4]    *State v. Hughes*, 2014-KA-487 (La. App. 5th Cir. 11/25/14), 165 So.3d 978; State Rec., Vol. 1 of 7.

[5]    *State v. Hughes*, 2014-K-2683 (La. 10/9/15), 178 So.3d 1001; State Rec., Vol. 1 of 7.

[6]    State Rec., Vol. 2 of 7, Uniform Application for Post-Conviction Relief.

witness, who was a friend of Hughes, at trial.    On February 21, 2017, the state district court denied his application for post-conviction relief.[7]    The district court first noted that he failed to specify with reasonable particularity the factual basis for his first ineffective-assistance claim as required by Louisiana Code of Criminal Procedure article 926(B)(3). The court then denied that claim, along with the others, on the merits.    His related supervisory writ application was denied by the Louisiana Fifth Circuit Court of Appeal on June 7, 2017.[8]    The court of appeal rejected the first claim citing Louisiana Code of Criminal Procedure article 926(B)(3) and denied the remaining claims on the merits.    He subsequently filed a supervisory writ application with the Louisiana Supreme Court.    On October 15, 2018, the Louisiana Supreme Court denied relief on the merits stating, "[r]elator fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*."[9]

In November 2018, Hughes filed his federal application for habeas corpus relief asserting the same three ineffective-assistance-of-counsel claims he raised on post-

---

[7] State Rec., Vol. 2 of 7, State District Court Order, 2/21/17; *see also* Rec. Doc. 3-5, p. 59.

[8] State Rec., Vol. 3 of 7, *Hughes v. Vannoy*, 2017-KH-188 (La. App. 5th Cir. June 7, 2017); *see also* Rec. Doc. 3-5, p. 27.

[9] *State ex rel. Hughes v. State*, 2017-KH-1198 (La. 10/15/18), 254 So.3d 683; State Rec., Vol. 3 of 7.

conviction review.[10]   The State's response concedes that the federal application is timely

and that his claims were exhausted in the state courts.[11]   As to claim one, the State submits

that it should be rejected as procedurally defaulted based on the intermediate court's ruling

and the presumptive adoption of those grounds by the Louisiana Supreme Court, or

alternatively denied on the merits along with his other claims.

### Facts

On direct appeal, the Louisiana Fifth Circuit summarized the following facts adduced

at trial:

> Shane Petty, a victim of the shooting incident and the nephew of the murder victim (Mr. Williams), testified that he was present on January 2, 2012 when defendant shot and killed Mr. Williams. He also identified defendant in court.
>
> Mr. Petty testified that he and Mr. Williams ran errands for the family that day, visiting several stores together on the date of the incident. He stated that they also visited the residence of Mr. Williams' fiancé, Rachel Durall, where defendant was present. While at Ms. Durall's residence, Mr. Williams and defendant had a "basic conversation" about Ms. Durall. According to Mr. Petty, he had no reason to believe that the conversation would lead to later violence between the two and believed the problem was solved. Mr. Petty stated that after he and Mr. Williams finished visiting the stores, they visited the home of Mr. Petty's grandmother, Barbara Williams, who was also Mr. Williams' mother. As Mr. Petty left Ms. Williams' house, Ms. Williams stopped him and told him to let Mr. Williams (the victim) bring him home because Mr. Petty did not have car insurance. Mr. Petty stated that as a result, he and Mr. Williams left the house together in a vehicle belonging to Mr. Petty's mother, with Mr. Petty driving.
>
> Mr. Petty stated that after leaving the house, they turned on Spruce Street,

---

[10]   Rec. Doc. 3, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

[11]   Rec. Doc. 11, pp. 8-9.

where defendant was standing on the corner. He testified that defendant "flagged" them down, and Mr. Williams told Mr. Petty to stop the vehicle. Mr. Petty stated that an altercation began, with defendant stating that he did not like what had occurred in their first conversation. Mr. Petty stated that Mr. Williams responded that he thought the first conversation was finished. The argument became louder, angrier, and more heated. Mr. Petty stated that Mr. Williams was angry, and both Mr. Williams and defendant elevated their voices. He stated that Mr. Williams attempted to exit the vehicle, and at that point defendant backed up, opened fire, and shot him. Mr. Petty stated that after defendant began shooting, he had to "run for his life" around the corner of the houses. Mr. Petty stated that when he looked back, he saw that defendant was shooting while running in the opposite direction.

Mr. Petty testified that he and Mr. Williams did not have a gun during the incident. He stated that only one gun was involved, and that defendant was the only person who fired a gun. He stated that after the shooting, he ran directly to his grandmother's house and informed her of the shooting. As he and his grandmother walked back to the crime scene, he realized that he had been injured. Mr. Petty stated that he did not enter the vehicle at that point. He explained that he was afraid to return to the vehicle because he believed his uncle had been killed, and he did not want to see him in that condition. He further testified that he did not remove anything from the vehicle and did not see anyone, other than an officer or an emergency responder, remove anything from the vehicle. Mr. Petty said that he did not see the person who opened the car doors remove anything from the vehicle. He also testified that there were more than four people around the vehicle.

Mr. Petty stated that he provided a statement to officers and identified defendant as the shooter in a photographic lineup. Officers took photographs of his injuries sustained during the shooting incident, and he testified that the photographs accurately depicted his injuries. He testified that he never had any dispute with defendant and that defendant had no reason to shoot him on the date of the incident. According to Mr. Petty, he did not attack defendant, and instead, he exited the vehicle and fled in a different direction.

On cross-examination, Mr. Petty acknowledged that although the conversation became heated, he and Mr. Williams chose to stay during the altercation when they could have driven away. He also stated that Mr. Williams told defendant that if he had something against him, then he would have previously "smacked" him when they first met. Mr. Petty further stated that Mr. Williams

was "furious" because he believed defendant was behaving disrespectfully to him during the conversation.

Barbara Williams, the mother of the murder victim, testified on behalf of the State that prior to the shooting, her son (Mr. Williams) left her house with her grandson, Mr. Petty. She explained that Mr. Williams was accompanying Mr. Petty to the house of her daughter, who was also Mr. Petty's mother. Ms. Williams stated that it was common for her family to drive down Avenue I to Spruce Street to exit the neighborhood and reach her daughter's house.

Ms. Williams stated that within minutes after Mr. Williams and Mr. Petty left her house, Mr. Petty returned and informed her that her son was the victim of a shooting. According to Ms. Williams, neither she nor Mr. Petty called 9–1–1 on the date of the incident. She further stated that she walked up to the vehicle and saw her son lying inside. She explained that Mr. Williams' eyes were open at first, and when his eyes closed, she called her daughter. She also testified that she did not see Mr. Williams or Mr. Petty with a gun, she did not keep a gun in her house, and she did not know Mr. Williams to possess a gun. Ms. Williams further testified that no one brought a gun to her house after the shooting.

M.H., who was eleven years old at the time of trial, testified that on the date of the incident, she and her younger brother were in her mother's vehicle, which was parked outside of their residence on Spruce Street. M.H. testified that a man and two boys were talking while standing on the sidewalk. She stated that a gold SUV pulled up and stopped. M.H. stated that the passenger of the SUV and the man on the sidewalk began arguing. She testified that as the arguing became louder, the man standing outside the SUV pulled a gun from his jacket pocket and shot the other man. According to M.H., she did not see anyone else with a gun. She also stated that she was unable to see inside the SUV.

M.H. said that after the shooting began, she grabbed her younger brother, ducked between the car seats, and continued to peek. She also stated that the two boys on the sidewalk began running, and the driver of the SUV jumped out and also began running. M.H. testified that after the shooter shot the man, he ran to a corner,[12]  shot "on the ground," and ran towards the back street of the neighborhood. M.H. testified that the driver of the SUV did not have anything

---

[12]  It appears that M.H. was referring to the shooter at this point, because the prosecutor had asked her to describe the actions of the shooter.

in his hands when he exited the vehicle because he was pulling his pants up.

M.H. stated that after the shooter left the scene, her mother told her to grab her brother, and they ran inside their house and locked the doors. M.H. stated that she later provided a statement to police officers. She explained that she was unable to identify anyone from a photographic lineup because she only saw the side of the shooter's face. M.H. described the perpetrator as wearing a black coat, having dreadlocks that reached down to the middle of his back, and having gold teeth.

On cross-examination, M.H. testified that she saw the vehicle that was occupied by the victims circle the street twice. She also acknowledged that in her statement to the police, she stated that she did not see "the guy run from the car." On redirect, M.H. explained that she was nervous, shaking, and crying when she spoke to the police, but that she really did see someone exit the vehicle. She also stated that she only saw one gun during the incident.

Chiva Lagarde, who testified for the State, stated that at the time of the shooting, she was inside of her residence on Spruce Street near the corner of Avenue I. She stated that prior to the shooting, she brought the garbage outside and saw defendant, Rashad Walker, and David Alexander walking towards Spruce Street. She explained that she knew defendant, Mr. Williams, Mr. Petty, Mr. Walker, and Mr. Alexander from the neighborhood.

Ms. Lagarde stated that she returned inside and was in her kitchen cooking when she heard gunshots. After the shooting, she looked out of her screen door and saw two people running. Defendant was running farther away from her residence, and the other unknown person ran through the field across from her residence. She stated that she was unable to determine whether either person held a gun because she was not wearing her eyeglasses at that time. Ms. Lagarde stated that after the shooting, she called 9–1–1, went outside, and saw people walking towards the vehicle.

Ms. Lagarde walked towards the vehicle and saw someone sunken in between the two front seats. She testified that another female, possibly named Shandell, opened the driver side door and screamed. Ms. Lagarde stated that she opened the passenger side door because she was unable to see anything through the driver's side. She stated that Mr. Williams looked at her and made guttural noises as if he was trying to speak to her. She testified that she did not see a gun in the vehicle, but she was focused on Mr. Williams and not on the interior

of the vehicle. Ms. Lagarde also testified that she did not remove a gun from the vehicle and did not see anyone else remove a gun from the vehicle. She stated that she saw Mr. Petty outside after the shooting, but she was unsure whether or not he approached the vehicle.

Sergeant Michael Nocito, a road supervisor of the Westwego Police Department, testified on behalf of the State that on January 2, 2012, he was the first officer to respond to a shooting that occurred in the 1000 block of Spruce Street in Westwego. Sergeant Nocito stated that he observed a black male in the passenger seat of a SUV. He described the victim as being slumped over the console towards the back of the vehicle and that the top portion of his shirt was "full of blood." Sergeant Nocito explained that after he secured the crime scene, he located the driver of the vehicle.

Keith Dykes, a former uniformed patrolman of the Westwego Police Department, testified on behalf of the State that on the date of the incident, he patrolled the neighborhood where the shooting occurred. He stated that he stopped three individuals who fit the general description of the subjects. Mr. Dykes stated that he conducted a field interview of two of the subjects, and another officer conducted a field interview on the third subject. According to Mr. Dykes, the subjects identified themselves as "Jared" Walker and David Alexander during the interview. On cross-examination, Mr. Dykes stated that his attempt to verify the information by conducting a search for both names yielded no results. On redirect, Mr. Dykes testified that another officer was able to determine that Mr. Walker had provided a false name.

Detective Corey Boudreaux of the Westwego Police Department testified on behalf of the State that on the date of the incident, he was working dually as a patrolman and a crime scene technician. He testified that he did not locate any firearms in the vehicle or anywhere on the scene. He stated that the evidence collected at the scene included spent casings and bullet fragments. On cross-examination, Detective Boudreaux acknowledged that although he did not see anyone access the vehicle, anyone was able to access the vehicle.

Thomas Bryson, a former officer of the Westwego Police Department, testified on behalf of the State that on the date of the incident, he participated in the investigation that led to the arrest of defendant for the shooting death of Mr. Williams. Mr. Bryson testified that he did not develop any information or any physical evidence that would indicate that there was more than one gun at the time of the shooting. Mr. Bryson stated that one or more 9–1–1 callers

provided information that there was one suspect. He explained that one 9–1–1 caller stated that three black males left the area, which prompted the officers to look for those subjects to be traveling together.

Mr. Bryson also testified that he interviewed Mr. Petty on the date of the incident. He stated that Mr. Petty appeared nervous. He became aware that Mr. Petty had suffered injuries and that he received medical treatment after the interview. According to Mr. Bryson, after defendant had been developed as a possible suspect, he presented Mr. Petty with a six-panel color photographic lineup. Mr. Bryson stated that Mr. Petty identified defendant as the person he saw commit the shooting.

Mr. Bryson explained that although he made efforts to discover the firearm used in the incident, including executing a search of defendant's residence twice, he was unable to locate the firearm.

Mr. Bryson testified that Rashad Walker was the only person to make a statement that suggested there was more than one gun. However, although Officer Dykes conducted a field interview of Mr. Walker on the date of the incident, Mr. Walker provided an inaccurate name and also did not mention at that interview that he had witnessed the shooting. According to Mr. Bryson, Mr. Walker provided three taped statements to the police, including a statement on January 4 and two statements on January 11. Nine days after the date of the incident, in his second taped statement on January 11, 2012, Mr. Walker indicated for the first time that the victim, Mr. Williams, had a gun at the time of the shooting. According to Mr. Bryson, Mr. Walker did not provide this information in his first two taped statements.

In addition, Mr. Bryson stated that relevant information was recorded by two neighborhood crime cameras in close proximity to the incident, located on Avenue I and Spruce Street, and at Avenue I and Sixth Street. He testified that although it "panned away" immediately before the shooting, one of the crime camera's recordings depicted the victim's SUV and the three individuals standing near the vehicle. Mr. Bryson further stated that the crime camera's recording depicted an individual, later identified as Mr. Petty, lift up his shirt and examine his body. The crime camera also showed a woman, later identified as 9–1–1 caller Ms. Lagarde, running towards the vehicle. He further testified that between the time that the shooting would have occurred and the time the recording ended approximately forty minutes later, he did not observe anyone that was non-law enforcement remove a gun or any other

object from the vehicle.[13]  Mr. Bryson further explained that the second crime camera showed a "moving shape" in an open area behind M.H.'s house traveling in the direction of Mr. Petty's grandmother's house, which was consistent with the path that Mr. Petty described taking after the shooting incident.

On cross-examination, Mr. Bryson testified that the recording from the crime camera did not reflect that Ms. Lagarde entered the vehicle. Mr. Bryson testified that Ms. Lagarde opened the doors of the vehicle to check on the victim's well-being because she knew the victim. Mr. Bryson also stated that Mr. Petty returned to the crime scene along with his grandmother, Ms. Williams, but the recording reflected that Mr. Petty remained away from the vehicle. Mr. Bryson acknowledged that the crime camera panned away from the vehicle approximately every eight to fifteen seconds, and therefore, the vehicle was not in view the entire time. Mr. Bryson further acknowledged that he was unable to unequivocally determine that Mr. Petty was the individual running in the recording. Mr. Bryson further stated that the only bullets found at the crime scene were bullet fragments, which were too damaged to be tested by ballistics experts. On redirect, Mr. Bryson explained that his search for ballistic material extended all the way to the end of the block.

Dr. Dana Troxclair of the Jefferson Parish Coroner's Office was qualified as an expert in forensic pathology. Dr. Troxclair testified on behalf of the State that she performed an autopsy on the victim.[14]  Dr. Troxclair testified that Mr. Williams' cause of death was a single gunshot wound to the front of the neck. She explained that the gunshot wound indicated that the gun was fired from two to three feet away. According to Dr. Troxclair, the blood in the victim's lungs and stomach indicated that he was alive for at least a few seconds to a couple of minutes after being shot. She also stated that a projectile was recovered from the victim's body.

Jene Rauch, a forensic scientist of the Jefferson Parish Sheriff's Office crime lab, was qualified as an expert in firearms, tool mark examination, and shooting reconstruction based on a stipulation by both parties. Ms. Rauch testified that

---

[13]  Mr. Bryson testified that according to the crime cameras, the shooting occurred at 5:22:14 p.m. and the recording ended at 6:00 p.m.

[14]  Dr. Troxclair also stated that she prepared an autopsy report, which included a toxicology report, which was negative for drugs or alcohol in Mr. Williams' urine or blood.

she conducted firearms analysis in the investigation of the shooting death of Mr. Williams. She explained that she examined ten 9 mm fired cartridge casings, a projectile from the autopsy, and jacket fragments and lead-like projectiles recovered from the vehicle. She testified that after she examined the firearms evidence for purposes of firearms identification, she determined that all ten 9 mm casings were fired from the same weapon. She was also able to determine that the projectiles and jacket fragments were all fired from the same class and type of barrel, but was unable to determine that they were fired from the same weapon. She stated that she was able to determine that the bullet recovered from the autopsy was a .38 caliber class, which was consistent with 9 mm casings. Ms. Rauch testified that there was no evidence presented to her that would suggest that more than one weapon was fired. She further stated that the weapon used to murder Mr. Williams was never presented to her for examination.

Ms. Rauch testified that the vehicle had four bullet entrances, which showed that the bullets came from outside the vehicle and traveled into the vehicle. She also explained that she could only conduct a trajectory analysis on one entrance hole for various reasons. She determined that one of the bullets traveled from the vehicle's front passenger's side towards the driver's side at a slightly downward angle.[15]

Ms. Rauch explained that there were two distinct groups of casings which included four casings in the first group and six casings in the second group. Regarding the first group of casings, she was able to determine based on the cartridge case placement, trajectories, and bullet holes in the vehicle that the vehicle was likely stationary and the shooter was stationary at or near the passenger's side of the vehicle. She also stated that the fire was concentrated on the front part of the vehicle. Regarding the second group of casings, Ms. Rauch explained that the linear pattern was consistent with a mobile shooter who was firing at the victim while he was moving. She further testified that the casings found would be consistent with the suspect firing at Mr. Petty as he fled while the suspect fled in the other direction. She further testified that she believed that all of the shots were fired continuously within eight seconds.

---

[15]  Ms. Rauch also stated that the crime lab no longer performs gunshot residue tests because the tests only determine that a person was in close proximity when a gun was fired. She explained that approximately 80 per cent of gunshot victims test positive for gunshot residue although they never fired a weapon.

The defense presented testimony contrary to the version of events offered by the State's witnesses. Rachel Durall testified on behalf of the defense that between 2:00 p.m. and 4:00 p.m. on the date of the incident, defendant was at her residence for about ten minutes. She explained that defendant was sitting and smoking near the threshold of her door. According to Ms. Durall, Mr. Williams, her fiance, entered her residence and asked defendant to leave in order to have a private conversation with Ms. Durall. Ms. Durall stated that Mr. Williams gently grabbed her around her shoulders and stated he loved her and wanted to marry her. Ms. Durall then asked Mr. Williams to leave her residence. At first, she stated that Mr. Williams left immediately. However, after being refreshed by her previous statement to officers, she remembered asking Mr. Williams to leave again.[16] Ms. Durall also stated that her mother had to assist her in removing both defendant and Mr. Williams from her residence.

Rhonda Nicole Carter, the mother of defendant's son, testified on behalf of the defense that between December 10th and 20th of 2011, Mr. Williams threatened to kill defendant as she, defendant, and their two-year-old son, Everett, Jr., were walking down Fourth Street in Westwego. Mr. Williams approached them in an SUV and told defendant that "it was down." She explained that she did not know Mr. Williams by name at that time. The conversation between Mr. Williams and defendant became louder and an argument ensued. She stated that she told Mr. Williams and defendant to stop arguing in front of her son. Ms. Carter explained that she overheard Mr. Williams state, "I'll kill you right now. I'll kill you and your family." Ms. Carter stated that she stood in front of defendant and asked Mr. Williams to move on. According to Ms. Carter, Mr. Williams stated, "Ni* * *r, this ain't over" as he pulled off. Ms. Carter explained that she did not call the police because she did not want to be labeled a "snitch," and she was scared for her life.

Ms. Carter also stated that she saw a gun on Mr. Williams' lap. On cross-examination, Ms. Carter testified that Mr. Williams had a semi-automatic weapon. She recognized the type of gun because it was the same type she carried while being employed at a security company. Ms. Carter stated that Mr. Williams was the man that threatened her and her family based on information from the Westwego Police Department. She later stated that she recognized Mr. Williams after seeing his picture in the newspaper. Ms. Carter testified that defendant did not have a gun at the time of Mr. Williams' threats

---

[16] In this statement, Ms. Durall says that she and Mr. Williams had broken up.

and did not own a gun on the date of the incident.[17]

### Preliminary Review-Procedural Default

As a preliminary matter, the Court considers the State's assertion that Hughes' first claim of ineffective assistance of counsel was procedurally barred under state law by the state courts and thus procedurally defaulted on federal review.    Here, as the State asserts, the state district court and intermediate court of appeal denied relief on procedural grounds (Louisiana Code of Criminal Procedure article 926(B)(3)).    The Louisiana Supreme Court then denied relief, stating that "[r]elator fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*."    The State submits that because it is "unclear whether or not the Louisiana Supreme Court ruled on the merits of the claim or followed the courts before it with the appropriate procedural denials," the federal court should "look through" the order to the last reasoned state court judgment on the same claim, *i.e.*, the intermediate court of appeal opinion, and *presume* that the order rests on the same grounds as that judgment.    However, the ruling by the Louisiana Supreme Court was not a silent or unexplained order rejecting the claims as contemplated by the United States Supreme Court in *Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991), in which the Court fashioned the presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."    *Id.* at 803, 111 S.Ct. at

---

[17]    *State v. Hughes*, 165 So.3d at 983-989 (footnotes in original).

2594.    Rather, the stated reasons for the denial plainly reference federal law, namely *Strickland*, which applies to all three ineffective-assistance-of-counsel claims.    Considering the final reasoned disposition, it does not appear that the Louisiana Supreme Court relied on a state-law procedural bar in rejecting claim one.    If the last state court to reach the issue looks to its merits, then the federal courts are also free to review the issue on its merits.    *Id.* at 801.    For this reason, the Court rejects the State's assertion that Hughes' first claim is procedurally defaulted and turns now to the State's alternative argument for denial of the claims on the merits.

### Standards of Review on the Merits

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of

law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 134 S.Ct. 1697, 1706 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an

incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Claims for Relief

Hughes raises three claims of ineffective assistance of trial counsel.    In his first claim, he argues that trial counsel was ineffective for failing to object contemporaneously at trial.    In the second claim, he asserts that counsel was ineffective for failing to interview and call witnesses for the defense and for not objecting when the State prosecutor elicited information gleaned from those witnesses by a detective as part of his investigative process and then presented it to the jury as part of the prosecution's case at trial.    His third claim alleges ineffective assistance for failing to investigate and present a potential defense witness who purportedly possessed exculpatory evidence helpful to the defense.

The United States Supreme Court has established a two-pronged test for evaluating claims of ineffective assistance of counsel. Specifically, a petitioner seeking relief must

demonstrate both that counsel's performance was deficient and that the deficient performance prejudiced his defense.     *Strickland v. Washington*, 466 U.S. 668, 697 (1984). A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."     *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, *i.e.*, deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.     *Strickland*, 466 U.S. at 697.

To prevail on the deficiency prong of the *Strickland* test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.     *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).     Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *See Strickland*, 466 U.S. at 689.     "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"     *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).     A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.     *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986);

*Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the *Strickland* test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). The Supreme Court recognized the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id*. at 105 (citations and quotation marks omitted).

Because the state courts rejected Hughes' ineffective-assistance claims on the merits and because such claims present a mixed question of law and fact, this Court must defer to the state-court decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).    Indeed, federal habeas corpus review of ineffective assistance of counsel claims must be "doubly deferential" to give both the state court and the defense attorney the benefit of the doubt.    *Burt v. Titlow*, 571 U.S. 12, 15, 134 S.Ct. 10, 187 L.Ed.2d 348 (2013) (citing *Cullen v. Pinholster*, 563 U.S. at 190).    For the following reasons, the state courts' determination in this case was neither contrary to, nor an unreasonable application of, clearly established federal law.

First, Hughes argues that trial counsel failed to lodge contemporaneous objections during trial.    The claim was asserted in the state courts on post-conviction review in the same cursory manner as here, with no factual support or explanation whatsoever.    He provides the Court with no specifics as to when defense counsel should have objected, what the basis for the objection should have been, or how the outcome would have been different had counsel objected.    He references only the direct-appeal opinion in which the Louisiana Fifth Circuit analyzed a sufficiency-of-the-evidence claim, noting that certain objections to evidence were not even raised by the defense at trial.    The Louisiana Fifth Circuit went on to find that the argument lacked merit regardless.[18]

---

[18]  *State v. Hughes*, 165 So.3d at 993-94.

It is well settled that conclusory allegations are not adequate to establish ineffective assistance of counsel.    *See Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *Brown v. Dretke*, 419 F.3d 365, 375 (5th Cir. 2005); *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir. 1998); *United States v. Daniels*, Civ. Action No. 08-104, 2011 WL 999529, at *7 (E.D. La. Mar. 18, 2011).    For this reason alone, Hughes has not established that he is entitled to relief on the ineffective assistance claim, and the state courts' denial of relief on this issue was not contrary to, or an unreasonable application of, *Strickland*.

Even gratuitously assuming, as did the state district court on post-conviction review and the State in its response, that Hughes' claim involves trial counsel's failure to object contemporaneously to Officer Bryson's testimony about Rashad Walker's statements to police, he has not met the requisite burden of proof on federal habeas review.    The statements at issue concerned Walker seeing a gun in the victims' possession.    Initially, during opening statements, the State mentioned that the evidence would show that Walker's statements about another gun at the scene were untruthful.    The defense objected several times,[19] but the trial court overruled the objections noting that it was merely an opening

---

[19]    State Rec., Vol. 4 of 7, Trial Transcript, p. 33 ("Number one, Your Honor, the State is arguing in his opening statement.    And number two, whether or not Rashad or David Alexander are truthful witnesses, it's up to the jury to decide their credibility and if they're truthful and if they're telling the truth, not for the State to tell them that they're not being truthful and that they weren't truthful in their statements."); p 35 ("Judge, he cannot say

statement, not evidence.[20]    The defense had subpoenaed Rashad Walker to testify at trial

and he was present;[21]    however, neither the defense nor the State called Walker as a witness.

The details involving Walker were elicited from Officer Bryson.    During Officer Bryson's

testimony, the state prosecutor asked him about his investigation surrounding the shooting,

including eyewitnesses and the information obtained from statements Rashad Walker made

to police.    Defense counsel then cross-examined Officer Bryson thoroughly regarding the

possibility of a second gun.[22]    Officer Bryson acknowledged that although there was a

witness who eventually mentioned another gun,[23]    he did not consider that as a realistic

possibility to investigate further in light of the evidence gathered over the course of the

investigation.[24]    Under the circumstances, defense counsel's decision simply to cross-

examine Officer Bryson extensively rather than raise a futile hearsay or confrontation

objection, as proposed by Hughes, was objectively reasonable and hardly deficient

---

what the man's going to say. He didn't call the man as a witness. If he wants to cross him when we call him, fine, but he can't tell the jury, this is what he told the police. That's hearsay. I don't care if it is opening statements.").

[20]    State Rec., Vol. 4 of 7, Trial Transcript, pp. 36-38.

[21]    State Rec., Vol. 4 of 7, Trial Transcript, pp. 8-9.

[22]    State Rec., Vol. 5 of 7, Trial Transcript, pp. 174-85.

[23]    The record shows that Walker was less than helpful in the early stages of the investigation and only mentioned these details after numerous interviews in a second taped statement. State Rec., Vol. 5 of 7, Trial Transcript, pp. 161-62.

[24]    *Id.* at 183.

performance.     Not only was the information brought out in the context of the steps taken to explain the police investigation, which is permissible under state law as the state district court and appellate court rulings noted,[25]  but the mere possibility of a second gun, no matter how remote the prosecution's case made it seem, supported the theory of self-defense. Notably, Rashad Walker had been subpoenaed for trial as a witness for the defense. Hughes certainly has not shown how the failure to object prejudiced either the defense of the case or his subsequent appeal of the convictions.     Accordingly, the state courts' denial of relief on this issue was not contrary to, or an unreasonable application of federal law as determined by the United States Supreme Court.

Next, Hughes asserts that trial counsel was ineffective for failing to interview and call two eyewitnesses, Rashad Walker and David Alexander, and for allowing the State to introduce the information gleaned from the uncalled witnesses through the prosecutor's opening statement and Officer Bryson's testimony.     The state courts rejected this claim on collateral review.

First, Hughes argues that trial counsel "failed to interview Rashad Walker and David Alexander and to investigate the facts and circumstances coming out of their testimonial statements to police."[26]     With respect to an attorney's duty to investigate, the controlling

---

[25] State Rec., Vol. 2 of 7, State District Court PCR Order; Vol. 3 of 7, Louisiana Fifth Circuit ruling.     *See also, e.g., Franks v. Cain*, Civ. Action No. 14-2748, 2017 WL 2662199, at *5 (W.D. La. May 15, 2017).

[26] Rec. Doc. 3-3, p. 18.

law provides:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Newbury v. Stephens*, 756 F.3d 850, 873 (5th Cir. 2014) (quoting *Strickland v. Washington*, 466 U.S. at 690-91).    A petitioner cannot show prejudice as to a claim that his counsel failed to investigate without adducing what the investigation would have shown and that the outcome would have been different as a result.    *Diaz v. Quarterman*, 239 F. Appx. 886, 890 (5th Cir. 2007) (citing *Strickland*, 466 U.S. at 696).

Defense counsel conducted extensive discovery in this case.    He was aware that Walker and Alexander were interviewed at the scene.    He also requested, received and reviewed the grand jury testimony, which included the testimony of Rashad Walker and David Alexander.[27]    In connection with the September 2012 motion-to-suppress hearing, the State produced for the defense the transcript of the grand jury testimony to be maintained under seal for record purposes to the extent it contained material testimony impacting the defense's motion to suppress Walker's identification of Hughes.[28]    The

---

[27]  State Rec., Vol. 2 of 7, State's Response to PCR, pp. 14-15.

[28]  State Rec., Vol. 1 of 7, Minute Entry, 09/28/12; State Rec., Vol. 4 of 7, Transcript of

record shows that the State included both Walker and Alexander on its witness list.[29] Defense counsel subpoenaed Walker, who was present for trial. The record shows that defense counsel was well-prepared for examining witnesses concerning Walker's statements to police during the investigation to advance the self-defense theory. The record reveals that Alexander had no information or knowledge that would have benefitted the defense.[30] Irrespective of whether he interviewed Walker and Alexander, defense counsel was certainly aware of the information they possessed and how it was relevant to the case. Hughes does not allege what further investigation would have revealed or how it would have altered the course of the proceedings.

Hughes also complains about the State's remarks during opening statements. However, he acknowledges that defense counsel immediately objected to the prosecutor's remarks concerning Walker and Alexander based on the fact that the State was making an improper argument rather than a statement, expressing an improper opinion on evidence, and the referenced statements were hearsay.[31] The trial court noted, "it's an opening

---

Suppression Hearing (9/28/12).

[29] State Rec., Vol. 1 of 7, State Witness List filed June 2013. The State unsuccessfully tried to subpoena Alexander for the June trial setting. He could not be located at the address on record which was apparently vacant. State Rec., Vol. 2 of 7, State's Response to PCR, p. 13 n. 11. *See also*, State Rec., Vol. 3 of 7, Subpoenas.

[30] See State Rec., Vol. 4 of 7, Trial Transcript, pp. 32-33.

[31] Rec. Doc. 3-3, p. 22.

statement," and that it had already instructed the jury that the statements by attorneys during opening were not evidence.    Even though defense counsel objected twice and strenuously argued his position with the trial court, his objection was overruled.    Hughes concedes that defense counsel objected based on hearsay.    However, he suggests that counsel should also have objected on other grounds, such as violation of due process, confrontation, and the right to cross-examination.[32]    These objections would have been futile considering the trial court's reasoning for overruling the hearsay objection.    The same reasoning applied with equal force to any additional arguments defense counsel could have raised at the time in the context of opening statements.    Under these circumstances, failure to make an objection for the additional grounds proposed does not constitute deficient performance.    *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").    Nor would Hughes be able to show any resulting prejudice from an omitted futile objection.

Hughes faults counsel for not calling Walker or Alexander as witnesses for the defense during trial and for allowing the State to elicit details about them through Officer Bryson's testimony regarding the criminal investigation.    As the record shows, Walker was present for trial but neither the State nor the defense called him as a witness.    It appears that Alexander was unavailable for trial as evidenced by the State's earlier unsuccessful attempts to subpoena him for a different trial setting (*see supra* n. 29).    The state courts

_____

[32]  Rec. Doc. 3-3, p. 18.

concluded that it was a reasonable trial strategy on the part of defense counsel not to call Walker as a witness and that Alexander's unavailability was not attributable to defense counsel.

As the United States Fifth Circuit Court of Appeals has explained regarding claims of uncalled witnesses:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").    Under the circumstances, the defense chose to rely on the evidence adduced rather than put Walker on the stand and emphasize the inconsistencies in his different statements to police and the initial false statements he made.    Although Hughes speculates that Walker would have been a beneficial witness for the defense, the record belies that assertion given his conflicting

statements.    Likewise, the record contains no evidence to demonstrate that Alexander would have been a helpful witness for the defense even if he could have been located.    Self-serving speculation that a witness' testimony would be favorable will not sustain an ineffective-assistance claim.    *See Yowell v. Thaler*, 545 F. Appx. 311, 314 (5th Cir. 2013) ("We have consistently held that conclusional and speculative allegations of ineffective assistance are not grounds for habeas relief.") (citing *Kinnamon v. Scott*, 40 F.3d 731, 734-35 (5th Cir. 1994); *Barnard v. Collins*, 958 F.2d 634, 642 n. 11 (5th Cir. 1992)).    The state courts' determination rejecting this claim for relief was not objectively unreasonable.

Finally, Hughes asserts that defense counsel was ineffective for failing to investigate and call Maurice Carmouche, a friend of Hughes, as a witness.    Hughes alleges that Carmouche had warned him prior to the incident that the murder victim, Williams, was looking for him and was armed with a pistol.    Specifically, he alleges that Carmouche would say that "on the date of, and prior to the incident," Williams came to his house, showed him a gun and told him to tell Petitioner " 'it's on', meaning that he was out to kill Petitioner."[33] He maintains that Carmouche was fully prepared and willing to give this testimony for the defense.    Hughes has not offered any affidavit to this effect.    He relies solely on his own speculative, self-serving allegations.    The state courts rejected the claim as factually unsupported, speculative and conclusory and therefore insufficient to prove ineffective assistance of counsel under *Strickland*.    Even if he had offered some objective support for

---

[33] Rec. Doc. 3-3, p. 28.

the allegation, the State further points out that such testimony would be merely cumulative of other defense witness testimony provided.    Rhonda Carter, who had a young son with Hughes, testified that about a month before the incident, she was present when Williams had a gun in his possession and threatened to kill Hughes and his family.[34]    As the court of appeal noted upon considering the overwhelming evidence adduced in this case, Hughes has not established a reasonable probability that, but for failing to call Carmouche (or the other two witnesses Walker/Alexander), the outcome would have been different.    The state courts' determination rejecting this claim was not contrary to or an unreasonable application of federal law.

Accordingly, for the reasons expressed, the state courts' denial of relief on the ineffective-assistance-of-counsel claims was not contrary to or an unreasonable application of *Strickland*.    Thus, Hughes is not entitled to federal habeas corpus relief.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Hughes' application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions

---

[34]    State Rec., Vol. 6 of 7, Trial Transcript (Rhonda Nicole Carter), pp. 154-158.

accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[35]

New Orleans, Louisiana, this __28th__ day of _____May_____, 2019.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[35]   *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.